# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **SCOTTISH HOLDINGS, INC.**, *et al.*, | Case No. 18-10160 (LSS) |
| Debtors.[1] | (Jointly Administered) |
| | Hearing Date: January 25, 2019 at 2:00 p.m. (ET) |
| | Objection Deadline: January 18, 2019 at 4:00 p.m. (ET) |

**MOTION OF HSCM BERMUDA FUND LTD. TO (I) ENFORCE STALKING HORSE PROTECTIONS, (II) DIRECT DEBTORS TO PAY AMOUNTS DUE TO HSCM BERMUDA FUND LTD. AS "EXPENSE REIMBURSEMENT AMOUNT" UNDER STALKING HORSE STOCK PURCHASE AGREEMENT, AND (III) GRANTING RELATED RELIEF**

HSCM Bermuda Fund Ltd. ("Hudson" or the "Stalking Horse"), by and through its undersigned counsel, hereby moves (the "Motion") the Court for entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), (i) enforcing the Stalking Horse Protections (as defined herein); (ii) directing the above-captioned debtors and debtors-in-possession (the "Debtors") to pay the "Expense Reimbursement Amount" that is owed and currently due to HSCM Bermuda Fund Ltd. pursuant to that certain Stock Purchase Agreement between the Debtors and the Stalking Horse dated as of January 28, 2018 (the "Stalking Horse SPA"); and (iii) granting related relief. In support of its Motion, Hudson respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Almost a year ago, and after more than a year of diligence and negotiation, Hudson finalized the terms of an arm's-length acquisition transaction with the Debtors that

---

[1] The Debtors, along with the last four digits of their federal tax identification numbers, are as follows: Scottish Holdings, Inc. (4408) and Scottish Annuity & Life Insurance Company (Cayman) Ltd. (3285). The Debtors' mailing address for purposes of these chapter 11 cases is 14120 Ballantyne Corporate Place, Suite 300, Charlotte, NC 28277.

resulted in the Stalking Horse SPA, an agreement that formed the centerpiece of the Debtors' plan of reorganization and exit strategy from chapter 11.  As is typical, as part of this deal, Hudson negotiated bid protections that were tailored to the unique requirements of transacting with regulated entities like the Debtors.  Hudson knew that if it were outbid in the auction process, any alternative transaction with another bidder would take an extended period of time to get the required regulatory approvals before such transaction could close.

2. The Stalking Horse SPA accomplished exactly what the Debtors had hoped it would.  As a result of the Stalking Horse SPA and subsequent auction, an incremental nine million dollars became available for the Debtors and their estates.  Also, as expected, the regulatory approval process for the Winning Bidder (as defined herein) is taking an extended period of time, and the alternative transaction contemplated between the Winning Bidder and the Debtors still has not closed, over five months after the Court entered its Winning Bidder Order (as defined herein).[2]

3. Notwithstanding (1) the clear, heavily-negotiated terms of the Stalking Horse SPA, which included protections (the "Stalking Horse Protections") that were incorporated into the bidding procedures and were approved by the Court; (2) that all proper notice and termination procedures were followed by Hudson in terminating the Stalking Horse SPA and requesting payment of the Expense Reimbursement Amount; (3) that there were no objections to Hudson's Expense Reimbursement Amount; (4) upon information and belief, the Debtors have the current ability to pay such Expense Reimbursement Amount; and (5) repeated overtures from

---

[2] Indeed, at a status conference held last month, the Debtors reported to the Court that the "Outside Date" in respect of the Winning Bid has passed, and while the Debtors are negotiating regarding a possible extension, no agreement had yet been reached.

Hudson to the Debtors seeking payment of the Expense Reimbursement Amount, the Debtors have thus far refused to pay Hudson the Expense Reimbursement Amount that is currently due.

## JURISDICTION AND VENUE

4.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and Hudson confirms its consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court solely in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.  The statutory bases for the relief requested in this Motion are sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

## BACKGROUND

7.  Prior to the commencement of this chapter 11 case, Hudson and the Debtors engaged in extensive, arm's-length negotiations in contemplation of a transaction by which the Stalking Horse would purchase substantially all of the Debtors' assets through a subsequent bankruptcy proceeding.

8.  On January 28, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors' cases are being jointly administered for

procedural purposes only. The Debtors continue to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.     On the Petition Date, the Parties executed the Stalking Horse SPA. The Stalking Horse SPA contemplated that, subject to higher and better bids solicited in accordance with bidding procedures to be approved by the Bankruptcy Court, and upon closing of the Stalking Horse SPA and the effective date of the Debtors' plan of reorganization, the Stalking Horse would acquire effective ownership of reorganized debtor Scottish Annuity & Life Insurance Company (Cayman) Ltd. and its subsidiaries other than Scottish Financial (Luxembourg) S.á r.l.

10.     The Stalking Horse SPA provided that, in the event the Stalking Horse SPA were terminated in accordance with its terms, the Stalking Horse would be entitled to Stalking Horse Protections in the form of payment of a Break-up Fee and an Expense Reimbursement Amount. Specifically, the Stalking Horse SPA provided that, (i) **upon termination of the Stalking Horse SPA**, the Stalking Horse would be entitled to receipt of its Expense Reimbursement Amount in cash **within five business days following the Debtors' receipt of documentation supporting the request for the reimbursement**, and (ii) in the event the Debtors entered into an agreement with respect to an Alternative Transaction, the Break-up Fee would be payable **upon the closing of such Alternative Transaction**.[3]

11.     On January 31, 2018 the Debtors filed their *Motion of the Debtors For Entry of an Order (A) Approving Bidding Procedures in Connection with an Auction for Plan Sponsorship; (B) Approving Certain Stalking Horse Protections; and (C) Authorizing and Scheduling a Date and Time For an Action Pursuant to Such Procedures* [Dkt. No. 27] (the "<u>Bidding Procedures Motion</u>"), requesting the entry of an order approving certain bidding, auction, and notice

---

[3] The full text of Section 8.3 of the SPA, which addresses both of these separate protections, is attached hereto as <u>Exhibit B</u>.

procedures, approving and authorizing the payments of the Stalking Horse Protections as provided for in the Stalking Horse SPA, and authorizing the Debtors to conduct an auction (the "Auction") for the right to sponsor a plan of reorganization.

12.     On February 28, 2018, the Bankruptcy Court entered its *Order (A) Approving Bidding Procedures in Connection with an Auction for Plan Sponsorship or Other Alternative Transaction; (B) Approving Certain Stalking Horse Protections; and (C) Authorizing and Scheduling a Date and Time For an Action Pursuant to Such Procedures* [Dkt. No. 119] (the "Bidding Procedures Order").[4]  The Bidding Procedures Order approved specific procedures (the "Bidding Procedures") by which the Auction would be conducted, and reflected the terms of the Stalking Horse Protections, which were amended by consent of the Stalking Horse and the Debtors in the course of negotiations following the filing of the Stalking Horse Motion. Specifically, the Bidding Procedures Order approved the Stalking Horse Protections up to an aggregate amount not to exceed $1,250,000, payable as superpriority administrative expenses of the Debtors with priority over any and all administrative expenses of any kind and without further application to or order from the Bankruptcy Court.  The aggregate amount of the Stalking Horse Protections was reduced from $1,500,000, as a result of negotiations with the official committee of unsecured creditors (the "Committee") following the filing of the Bidding Procedures Order.  The Bidding Procedures Order also provided that the Debtors' obligations under the Stalking Horse SPA to pay the Stalking Horse Protections would survive termination of the Stalking Horse SPA.

13.     In order to receive its Expense Reimbursement Amount, the Bidding Procedures Order required the Stalking Horse to deliver to the Debtors, the U.S. Trustee, and counsel to the

---

[4] A copy of the Bidding Procedures Order is attached hereto as Exhibit C.

Committee a fee notice documenting the Stalking Horse's fees and expenses to be reimbursed (the "Fee Notice"). This provision was added at the request of the United States Trustee, which reviewed and commented on the Bidding Procedures. Consistent with the terms of the Stalking Horse SPA, the Bidding Procedures Order further provided that all fees and expenses that were not objected to in written objections filed in the Bankruptcy Court within five days after receipt of the Fee Notice would constitute valid expenses for purposes of the Expense Reimbursement Amount.

14. In accordance with the terms of the approved Bidding Procedures, the Auction was held on May 30, 2018, at the conclusion of which it was determined that Hildene Re Holdings, LLC ("Hildene") submitted the highest and best bid (such bid the "Winning Bid" and Hildene the "Winning Bidder").

15. In advance of the hearing to approve the Winning Bidder, the Debtors circulated a draft form of order to the relevant parties, including Hudson. Hudson's counsel requested language intended to ensure that the Winning Bidder Order (as defined below) did not affect its pre-existing rights under the Stalking Horse SPA.[5]

16. On June 12, 2018 the Bankruptcy Court entered its *Order: (I) Approving Debtors' Designations of (A) Winning Bid and Winning Bidder and (B) Backup Bid and Backup Bidder; and (II) Granting Related Relief* [Dkt. No. 346] (the "Winning Bidder Order"). Among other things, the Winning Bidder Order provides:

> **Subject to the terms and conditions of the Stalking Horse SPA, as modified by the Bidding Procedures Order, contemporaneously with the closing of the Winning**

---

[5] A copy of the email requesting the cross-reference to the Stalking Horse SPA is attached hereto as Exhibit D. While the email conflated the timing of the Break-up Fee and the Expense Reimbursement Amount, language that carried through the Winning Bidder Order reviewed by Hudson and ultimately entered by the Court, the issue before the Court in this Motion is not the genesis of the language, but its legal effect on Hudson's pre-existing and Court-approved rights. As discussed in detail below, the Winning Bidder Order did not change, and could not have changed, the terms of the Stalking Horse SPA as approved by the Bidding Procedures Order.

**Bidder SPA,** the Debtors are authorized and directed to pay the Break-Up Fee and the Expense Reimbursement Amount to HSCM Bermuda Fund Ltd., without further order of the Court.

Winning Bidder Order at ¶ 9 (emphasis added).

17. On August 20, 2018, the Stalking Horse terminated the Stalking Horse SPA in accordance with the notice and timing provisions therein, thereby entitling the Stalking Horse to payment of the Stalking Horse Protections pursuant to the terms and conditions of the Stalking Horse SPA and the Bidding Procedures Order.

18. The Expense Reimbursement Amount exceeds the aggregate cap on the Stalking Horse Protections, such that upon payment of the Expense Reimbursement Amount, no Break-up Fee will be payable.

19. On September 10, 2018, in accordance with the terms of the Stalking Horse SPA and the Bidding Procedures Order, the Stalking Horse sent its Fee Notice to the Debtors, the U.S. Trustee, and counsel for the Committee.

20. No written objections were filed in the Bankruptcy Court with respect to any fees and expenses constituting the Expense Reimbursement Amount.

21. Pursuant to the terms of the Stalking Horse SPA and the Bidding Procedures Order, the Expense Reimbursement Amount in an amount equal to $1,250,000 became due and payable on September 17, 2018.

22. A dispute has arisen as to the proper timing of payment for the Expense Reimbursement Amount. Specifically, the Debtors maintain that the terms of the Winning Bidder Order amended the terms of the Stalking Horse SPA and the Bidding Procedures Order such that the Expense Reimbursement Amount is not payable until the closing of the Alternative Transaction between the Debtors and the Winning Bidder.

**RELIEF REQUESTED**

23. By this Motion, Hudson respectfully requests the entry of the Proposed Order: (i) enforcing the Stalking Horse Protections; (ii) directing the Debtors to pay the Expense Reimbursement Amount; and (iii) granting related relief.

**BASIS FOR RELIEF REQUESTED**

24. It is well settled that bankruptcy courts have the jurisdiction to interpret and enforce their own orders. *LaTrobe Steel Co. v. United Steel Workers, Etc.*, 545 F.2d 1336, 1350 (3d Cir. 1976); *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del. 1999) (finding that the bankruptcy court "possesses the inherent authority to enforce its own orders."); *In re WorldCorp., Inc.*, 252 B.R. 890, 897 (Bankr. D. Del. 2000) (compelling party to make payment in accordance with agreement that was previously approved by court order). This authority is especially clear when the court explicitly retains jurisdiction to do so. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). The Court retained jurisdiction over any matters or disputes arising out of the interpretation of both the Stalking Horse SPA and the Bidding Procedures Order. *See* Stalking Horse SPA § 9.9;[6] Bidding Procedure Order at ¶ 25.

25. The Stalking Horse SPA expressly provides that if the Stalking Horse SPA is terminated in accordance with its terms as a result of the Debtors' entering into an Alternative Transaction with a third party, the Debtors "shall pay to [Hudson] in cash not later than five (5) Business Days following receipt of documentation supporting the request for reimbursement" the Expense Reimbursement Amount. Stalking Horse SPA § 8.3(b).

26. The Court approved the Stalking Horse Protections, including the payment of the Expense Reimbursement Amount, subject to three changes that resulted from negotiations

---

[6] The text of Section 9.9 of the Stalking Horse SPA is attached hereto as Exhibit E.

among Hudson, the Debtors, the Committee and the U.S. Trustee following execution of the Stalking Horse SPA: (1) a cap on the Stalking Horse Protections of $1,250,000; (2) a requirement that Hudson provide the U.S. Trustee and counsel for the Committee a copy of the Fee Notice required to be sent to the Debtors pursuant to the Stalking Horse SPA before payment of the Expense Reimbursement Amount becomes due; (3) a five day objection period in which a party could file written objections with the Court to certain amounts comprising the Expense Reimbursement Amount.  *See* Bidding Procedures Order ¶¶ 13-15.  Specifically, the Court found that "[t]he Stalking Horse Protections are necessary to maximize the value of the Debtors' estates" and that absent the Stalking Horse Protections, the Stalking Horse would not have entered into the Stalking Horse SPA, which would have "likely result[ed] in the Debtors realizing a lower price" in any Alternative Transaction.  *Id.* at ¶ 18.  Further, the Court ordered that "[t]he Debtors' obligations to pay the Break-Up Fee and the Expense Reimbursement Amount shall survive termination of the Stalking Horse SPA." *Id.* ¶ 17.  There is no dispute that Hudson has complied with all notice and timing requirements imposed by the Bidding Procedures Order, and that no objections were filed with the Court with respect to any amounts owed as part of the Expense Reimbursement Amount.  Because the Expense Reimbursement Amount exceeds the negotiated cap of $1,250,000, no additional amount in the nature of a Break-Up Fee will be payable pursuant to the Stalking Horse SPA.  There is no dispute that if any such amount were payable, payment would be made only at the time of closing of the Winning Bid.

27. The Debtors have maintained that the Court's Winning Bidder Order modified the carefully negotiated and Court-approved terms of the Stalking Horse SPA.  Specifically, the Debtors argue that the phrase "contemporaneously with the closing of the Winning Bidder SPA"

found in the Winning Bidder Order effected a modification of the timing requirements imposed by the Stalking Horse SPA and approved by the Court in the Bidding Procedures Order as to the Expense Reimbursement Amount, despite the lead-in language to the relevant sentence that specifically makes payment "subject to the terms and conditions of the Stalking Horse SPA, as modified by the Bidding Procedures Order".

28. The Debtors' position is untenable and their failure to pay is in clear violation of the terms of the Stalking Horse SPA and the Bidding Procedures Order. First, unlike the Bidding Procedures Order, nothing in the Winning Bidder Order reflects an intent to modify any part of the Stalking Horse SPA, and certainly not the carefully crafted Stalking Horse Protections. Indeed, the Winning Bidder Order itself acknowledges that is "subject to the terms and conditions of the Stalking Horse SPA, *as modified by the Bidding Procedures Order*." Winning Bidder Order at ¶ 9 (emphasis added). If the intent had been to use the Winning Bidder Order to further modify the Stalking Horse SPA (and putting aside the necessity of obtaining Hudson's consent therefor, as discussed below), the language would have read "as modified *hereby and* by the Bidding Procedures Order".

29. Moreover, the Winning Bidder Order's language stands in stark contrast with that of the Bidding Procedures Order: while the Bidding Procedures Order expressly stated that it modified the Stalking Horse Protections as found in the Stalking Horse SPA (Bidding Procedures Order at ¶ 13), no such language can be found anywhere in the Winning Bidder Order.

30. The suggestion that the Winning Bidder Order modified the Stalking Horse SPA also is contrary to the amendment provisions of the Stalking Horse SPA. The Stalking Horse SPA provides:

> Any provision of this Agreement may be amended, modified or waived if, and only if, such amendment, modification or waiver is in writing and signed, in the case of an amendment, by the parties, or in the case of a waiver, by the party hereto against whom the waiver is to be effective. No failure or delay by either party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Stalking Horse SPA § 9.3. There is no writing signed by any party agreeing to any amendment, modification, or waiver of the Stalking Horse SPA's provisions regarding the timing of the payment of the Stalking Horse Protections. Indeed, there was no discussion at any time following the Auction that the Winning Bidder Order would be used to materially and adversely affect Hudson's rights, as opposed to protecting and reconfirming such rights.

31.     The Debtors' attempt to enforce an amendment to the Stalking Horse SPA based on some implied consent by Hudson – or worse yet, a disingenuous suggestion that Hudson requested that the Stalking Horse SPA be modified in a manner adverse to its own interests – would, in any event, be ineffective and in violation of the express terms of the Stalking Horse SPA. Hudson relied on its negotiated agreement, to which the Winning Bidder Order was specifically made subject. While the Winning Bidder Order may not be a model of clarity, it is not and could not be a modification of the Stalking Horse SPA enforceable against Hudson.

## **NOTICE**

32.     Notice of this Motion has or will be provided to: (a) the Debtors; (b) the Office of the United States Trustee for the District of Delaware; (c) counsel to the Committee; and (d) all parties requesting notice in these chapter 11 cases pursuant to Local Rule 2002-1(b) as of the date thereof. In light of the nature of the relief requested herein, Hudson submits that no other or further notice is necessary.

## NO PRIOR REQUEST

33. No prior request for the relief sought in this Motion has been made by Hudson to this or any other court.

## CONCLUSION

WHEREFORE, Hudson respectfully requests the Court to enter the Proposed Order and grant such other and further relief as is just and proper.

Dated: January 4, 2019
Wilmington, Delaware

          YOUNG CONAWAY STARGATT & TAYLOR, LLP

          */s/ Robert S. Brady*

          Robert S. Brady (No. 2847)
          Rodney Square
          1000 North King Street
          Wilmington, DE 19801
          Telephone: (302) 571-6600
          Facsimile: (302) 571-1253
          rbrady@ycst.com

          -and-

          SIDLEY AUSTIN LLP

          */s/ Lee S. Attanasio*

          Lee S. Attanasio
          787 Seventh Avenue
          New York, NY 10019
          Telephone: (212) 839-5300
          Facsimile: (212) 839-5599
          lattanasio@sidley.com

          *Counsel for Hudson Structured Capital Management Ltd. and HSCM Bermuda Fund Ltd.*